# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

   vs.                                    Criminal No. 06-2607 MCA

**MICHAEL ANDREW MORALES**,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Mr. Morales' Motion for Suppression of Evidence and Incorporated Memorandum* [Doc. 16], filed January 24, 2007; *Mr. Morales' Motion for Discovery* [Doc. 17], also filed January 24, 2007; and *Mr. Morales' Motion for Daubert Hearing or, in the Alternative, to Exclude Evidence of Alleged Dog Alert Under Daubert* [Doc. 28], filed February 15, 2007.  The Court held hearings on the motions on March 1, 2007 and March 27, 2007.[1]  Having considered the parties' submissions, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court denies the motions.  In addition, I adopt the following as findings of fact.

---

[1] More specifically, the Court held hearings on Defendant's motions for discovery and suppression.  The Court did not hold a hearing on Defendant's <u>Daubert</u> motion but, instead, requested supplemental briefing on the issue.  Both sides filed their supplemental briefs on March 9, 2007 [<u>see</u> Docs. 41 and 42], and those briefs have been considered in Section II.C. of this opinion.

## I.      FINDINGS OF FACT

### A Canine Sniff: The Canine Certification Process in General

1.      Matthew Devaney is the Canine Training Coordinator with the Customs and Border Protection Office and Training Development National Canine Facility ("National Canine Facility") in El Paso, Texas.

2.      In that position, Mr. Devaney oversees and develops all training programs, develops all certification standards, instructs students, and oversees the training of canine handlers.

3.      Mr. Devaney began his career in canine training in 1980 with the Albuquerque Police Department ("APD").  He worked with APD for six years before taking a position with an organization that ultimately became the Alabama Canine Law Enforcement Officers' Training Center in Tuscaloosa, Alabama.  Mr. Devaney remained with the Alabama facility for another six years, working as training director, deputy director, and, ultimately, program director.  He left Alabama to found the National Canine Facility in El Paso in 1992.

4.      The National Canine Facility is a program of the United States Border Patrol.

5.      The National Canine Facility trains dogs to alert and indicate to concealed persons and to the odors of controlled substances and their derivatives.

6.      An "alert" is defined as a change in body posture and an increase in respiration when a dog first encounters an odor it has been trained to detect.

7.      The manner by which a dog alerts is "dog-specific" and could include such hallmarks

2

as twitching an ear or wagging the tail.  A handler is trained to recognize his or her particular dog's unique manner of alert.

8.      Sometimes a handler will interpret his or her dog's behavior as an alert, but no contraband is ultimately found.   When this occurs in a controlled training environment where it has been previously established that no trained odors are present, it is called a "false indication."   When this occurs in an uncontrolled field environment (such as a border checkpoint) where no contraband can be located, it is called a "nonproductive alert."

9.      Nonproductive alerts occur for a variety of reasons.  For example, a dog may alert to residual odor when the odor-causing instrumentality is no longer present.   A nonproductive alert may also occur because law enforcement agents are unable to find well-hidden contraband in the amount of time they operationally and legally may detain a suspect.  Consequently, the fact that a dog nonproductively alerts does not necessarily mean that the dog (or its handler) has acted in error.

10.     An "indication" is defined as trained behavior by the dog that pinpoints the source of odor.

11.     There are two types of indications. The first type is an "aggressive" (or "positive" or "active") indication, during which the dog will scratch or bite at the source of the odor.  The second type is a "passive" indication, during which the dog will sit down or point.

12.     All United States Border Patrol dogs are trained in passive indication.

3

13.     Mr. Devaney testified that the National Canine Facility maintains records documenting such confidential or sensitive information as how its dog/handler teams are trained; where they are trained; what they are trained to detect; and how they are rated (*i.e.*, average, excellent, etc.).

14.     Criminal organizations involved in smuggling undocumented persons and/or controlled substances have an obvious interest in the information contained in the National Canine Facility's records because an organization in possession of such information could then attempt to coordinate its illicit activities in such a way as to minimize its chances of being apprehended.

15.     If the records maintained on the dog/handler teams were redacted to prevent disclosure of the confidential or sensitive information described above, then the substantive portions of the remaining information would merely duplicate what already appears on the certification (discussed below) and in the testimony of the handler.

16.     I find and accept as credible Mr. Devaney's testimony in this regard.

17.     Due to the sheer volume of cases in which evidence supporting an indictment is based on the results of a canine sniff, it would be unduly burdensome to require the United States Border Patrol and/or the National Canine Facility to comply with the type of broad discovery request exemplified by Defendant Michael Andrew Morales's discovery motion in every case (or to produce a redacted version of the records in every case), absent a threshold showing that the dog/handler team was not certified

4

at the time of the canine sniff or that there is a specific reason to question the validity or reliability of the certification.

18.  Mr. Devaney wrote the National Canine Facility's certification procedure, which he developed from the international standard used by the former West German police.

19.  To become certified by the National Canine Facility, a team (dog and handler) must perform 14 searches in a variety of environments and achieve a total of 15 finds.

20.  A team may miss no more than 2 of the 15 finds.

21.  Dogs must additionally attend and pass a program administered by the United States Border Patrol Protection Training School in order to become certified.

22.  The various environments in which National Canine Facility certification searches are conducted include vehicle exteriors and interiors, residences, businesses, factories, and luggage.

23.  A team must conduct at least one search in limited light conditions, using only a flashlight.

24.  For each of the 14 searches it performs, the team receives a score for the search and indication it handles.

25.  The dog and handler are evaluated both individually and as a team on a numeric (rather than a pass/fail) scoring system.

26.  The dog and handler are scored individually to prevent the possibility of a strong dog carrying a weak handler, and vice versa.

27.  The numeric scoring system that the National Canine Facility uses provides a more

5

accurate assessment of ability than the pass/fail system employed by other canine certification programs.

28.    For a team to be certified, its final score must be below 3.5.

29.    In judging its search ability, a dog is evaluated on the basis of its hunting behavior, responsiveness to commands and direction, and confidence in various environments.

30.    The dog is also evaluated on its ability to indicate, which includes its odor-recognition behavior and its desire to pinpoint that odor.

31.    Distractions, such as food or toys, are placed in the search area, and the dog must pass over these distractions in order to complete the certification process successfully.

32.    A dog is rewarded with verbal and physical praise, and sometimes a toy or a treat, for correctly identifying trained odors.

33.    As part of its classical conditioning, a dog is rewarded by being allowed to play with a scented object it finds.

34.    If a dog is repeatedly exposed to certain stimuli that are associated with a particular reward, the dog will eventually link stimuli and reward.  Conflict training is employed to prevent a dog from incorrectly associating its reward with a neutral odor or source.

35.    Handlers also undergo rigorous training, both academic and performance-related.

36.    The complete handler program lasts five weeks.

37.    Handlers take a beginning quiz and a final examination.  The handler must score at least 80% on the final examination, which takes approximately 4 hours to complete.

38.    Once handler and dog become acclimated to one another, they undergo a three-week

training period, during which the handler is scored on every search performed.

39.  The handler is scored in areas including ritual or pre-search procedure, leash, speed, reading of the dog, and rewarding skills.

40.  At the end of the three-week training period, all of the handler's scores are averaged and the handler must achieve a total score of under 3.5 in order to be eligible to sit for the final examination.

41.  Once a handler takes the final examination, he or she is eligible to participate in the final certification process.

42.  Upon completion of the process described above, a team receives a letter stating that it has participated in the United States Border Patrol Detection Dog Certification program.

43.  Certification is valid for 12 months.

44.  Every United States Border Patrol canine undergoes the process described above.

45.  Once certified, a canine team must attend 16 hours of regular, monthly maintenance/continuing training to remain proficient in the detection of concealed humans and controlled substances.

46.  Teams are scored during this monthly maintenance/continuing training, and if a team falls below minimum standards it can be ordered to undergo remedial training or its certification can be revoked.

47.  I accept as credible Mr. Devaney's testimony as to the certification process.

7

## The Certification of the Dog/Handler Team in this Case

48.   Canine Laika conducted a sniff of Defendant's automobile on October 5, 2006.

49.   Laika is—and was at all relevant times—a certified United States Border Patrol dog.

50.   Agent Lance Hubert is employed by the United States Border Patrol.

51.   Agent Hubert has been an agent with the Border Patrol for five years, and has been Laika's handler for approximately two years.

52.   Laika has undergone the certification process described by Mr. Devaney in his testimony.

53.   Laika has been tested and scored individually for certification as described by Mr. Devaney in his testimony.

54.   Agent Hubert also has undergone the certification process described by Mr. Devaney.

55.   Agent Hubert has been tested and scored individually for certification as described by Mr. Devaney.

56.   Laika and Agent Hubert have been tested and scored as a team for certification as described by Mr. Devaney.

57.   Laika and Agent Hubert, as a team, passed their certification test on the first attempt.

58.   Laika's performance has never fallen below the standards outlined by Mr. Devaney in his testimony.

59.   Laika has undergone and passed the program administered by the United States Border Patrol Protection Training School.  Laika could not have become certified had she not undergone and passed this program.

60.     Both Laika and Agent Hubert have taken part in the 16-hour monthly maintenance/continuing training program described by Mr. Devaney.

61.     Laika has never failed and had to retake a test administered as part of her monthly continuing training.

62.     According to Agent Hubert, Laika has had three nonproductive alerts in her past.

63.     Because a nonproductive alert by definition occurs in an uncontrolled field environment, it is not possible to know if a nonproductive alert is also a miss. However, according to Agent Hubert, Laika has never falsely indicated, meaning she has never had a miss in a controlled training environment.

64.     On March 1, 2006, Laika and Agent Hubert participated in the United States Border Patrol Detection Dog Certification program, which consisted of 14 searches in a variety of environments and with a variety of distractions.  [Exh. 1].

65.     Laika and Agent Hubert successfully completed the certification program with the following scores:

   a.     Search Score: 2.42

   b.     Indication Score: 2.26

   c.     Handler Score: 2.42

   d.     Total Certification Score: 2.36

[Id.].

66.     The Total Certification Score of 2.36 that Laika and Agent Hubert received represents an above-average grade.  [Id.].

67. As of March 1, 2006, Laika and Agent Hubert were certified in the detection of concealed humans, as well as the odors of cocaine, marijuana, heroin, and methamphetamine, and their derivatives.

68. Because they were certified as of March 1, 2006, and a certification is valid for 12 months, Laika and Agent Hubert were certified on October 5, 2006 when Laika conducted her sniff of Defendant's car.

**The October 5, 2006 Stop, Sniff, and Search of Defendant's Vehicle**

69. Ricardo Sanchez is employed by the United States Border Patrol and is currently stationed in Fort Hancock, Texas.

70. On October 5, 2006, Agent Sanchez was a Senior Patrol Agent with the United States Border Patrol in Alamogordo, New Mexico and had been so employed for approximately six years.

71. At about 6:45 a.m. on October 5, 2006, Agent Sanchez was working in the primary inspection area ("primary") of the Highway 54 border checkpoint in the area of Alamogordo when Defendant approached the checkpoint in his vehicle.

72. Agent Sanchez observed that Defendant was traveling with a young female passenger.

73. That passenger was Crystal Montoya, Defendant's girlfriend at that time.

74. Defendant and Ms. Montoya are no longer romantically involved.

75. Agent Sanchez testified that he questioned Defendant as to his citizenship and Defendant responded that he is a United States citizen.

76. Agent Sanchez then learned that Defendant was traveling to Cloudcroft, New Mexico.

10

77. According to Agent Sanchez, Defendant hesitated when asked where and with whom he planned to stay in Cloudcroft.

78. Defendant ultimately told Agent Sanchez that he was staying with a friend named Billy, but could not remember Billy's last name.

79. Agent Sanchez conducted a visual inspection of the interior of the vehicle and noticed that the carpeting in the area of the driver-side rear window, under the lower section of the rear seats, had been tampered with, such that it was "sticking out in an unusual manner." [Suppression hearing testimony of Agent Ricardo Sanchez].

80. In Agent Sanchez's experience working at the checkpoint, altered carpet such as he observed in Defendant's car gives him "reasonable belief that there might be something concealed within the car." [Id.].

81. Agent Sanchez also testified that there was no luggage "that would indicate to [him] that [Defendant] would be staying for any amount of time somewhere." [Id.].

82. Ms. Montoya, however, testified that there were three "pretty big" (*i.e.*, approximately two feet in size) bags in the backseat of the car.

83. According to Ms. Montoya, one bag was her purse, another held her hair spray "and stuff," and the third contained her clothes.

84. Ms. Montoya testified that the bags were in the backseat and not the trunk because in the trunk was a large speaker that filled that entire compartment.

85. An *Otero County Narcotics Enforcement Unit Property Receipt* dated October 10,

2006, and signed by Ms. Montoya indicates the return to her of, among other things, one bag of cosmetics and three bags containing assorted garments.  [Exh. B].

86.   I find and accept as credible Ms. Montoya's testimony that there was luggage in the backseat of Defendant's vehicle.

87.   I do not accept as credible Agent Sanchez's testimony that there was no luggage in the backseat of Defendant's vehicle.

88.   Agent Sanchez testified that he asked Defendant if the car belonged to him, and Defendant stated that it did.

89.   According to Agent Sanchez, Defendant then reached into the glove box for his registration and presented it and his identification to Agent Sanchez with a visibly shaking hand.

90.   Based on his observations and Defendant's behavior, Agent Sanchez asked for and received consent to continue questioning Defendant in the secondary inspection area ("secondary").

91.   At some point during their conversation, Agent Sanchez asked Defendant for, and received, consent to conduct a canine sniff of the vehicle.

92.   Agent Sanchez knows that a sniff is not a search and, therefore, that consent is not required.

93.   Agent Sanchez testified that he detained Defendant in primary for no longer than one or two minutes before referring him to secondary.

94.   I find and accept as credible Agent Sanchez's testimony in this regard.

95.    After Agent Sanchez was relieved in primary, he had checks run on Defendant's vehicle and learned, among other things, that it had crossed into the United States from Mexico at the Bridge of the Americas port of entry on October 4, 2006.

96.    Agent Sanchez asked Defendant if he had crossed the Bridge of the Americas and Defendant stated that he had not.

97.    Defendant also told Agent Sanchez, however, that he was the only person who had been in possession of or driving the vehicle.

98.    Once the vehicle was in secondary and Agent Hubert had been summoned, he asked both Defendant and Ms. Montoya for consent to have Laika conduct a sniff of the vehicle.

99.    According to Agent Hubert, Defendant and Ms. Montoya nodded and proceeded to a bench that was approximately ten feet from—and faced—the passenger side of the vehicle.

100.   Agent Hubert then retrieved Laika from his service vehicle and Laika began her exterior sniff of the vehicle, beginning at the passenger-side door and continuing around the front bumper to the driver's side.

101.   Laika began to alert as she approached the driver-side door and was on alert as she jumped into the vehicle through the open driver-side window.

102.   Agent Hubert testified that Laika alerts by perking her ears and tail up and increasing her respiration.

103.   Agent Hubert testified that Laika alerted to Defendant's vehicle in this manner.

104.   I find and accept as credible Agent Hubert's testimony in this regard.

105.   Once in the vehicle, Laika jumped over the console and into the back seat, where she indicated near the driver-side back door.

106.   Agent Hubert testified that Laika indicated by lying down in the backseat.

107.   I find and accept as credible Agent Hubert's testimony in this regard.

108.   Agent Sanchez testified that he was watching Laika "through the corner of [his] eye" as Laika conducted her vehicle sniff.  [Testimony of Agent Sanchez].

109.   Agent Sanchez testified that Laika alerted to Defendant's vehicle very quickly, and that the vehicle was in secondary for no more than two or three minutes before she did so.

110.   I find and accept as credible Agent Sanchez's testimony in this regard.

111.   After Laika alerted and indicated, Agent Hubert physically and verbally praised her and put her away while another agent asked for consent to search the vehicle.

112.   The search began with the vehicle's rocker panel because that was the area in which Agent Sanchez reported to the other agents that he had observed the tampered-with carpet.

113.   A rocker panel is a section of body paneling in a vehicle that lies beneath the passenger compartment and, as described by Agent Hubert, is "the section or part . . . that goes across the whole vehicle . . . a flat part where there's a natural compartment there along the side."  [Suppression hearing testimony of Lance Hubert].

114.   When they searched the vehicle, agents discovered in screwed-down, after-market

14

compartments located on the driver-side rocker panel two packages, samples of which tested positive for cocaine.

115.   On December 21, 2006, Defendant was charged with possession with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. [Doc. 8].

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A. *Mr. Morales' Motion for Discovery* [Doc. 17]

Defendant "contends that [Laika] did not alert to the vehicle in any recognizable way, and that the search of his vehicle was without reasonable suspicion or probable cause, and was thus unconstitutional." [Doc. 17 at 2].  For that reason, Defendant seeks the disclosure of all records[2] relating to Laika's training and her handling while on the job.  [Id.].  The Government responds that it has met its burden of disclosure on this point by furnishing Defendant with proof that the team of Laika and Agent Hubert was properly certified on the date in question.  The Government also invokes the "law enforcement" privilege with respect to the requested documents.  [Doc. 20 at 6].  Because I conclude that, under the particular circumstances presented, the fact of Laika's proper certification is sufficient to establish her reliability, I need not reach the issue of the applicability of the "law enforcement" privilege.

Once a dog alerts to the presence of narcotics, border patrol agents have probable cause to search a vehicle for narcotics.  United States v. Pinedo-Montoya, 966 F.2d 591, 594

---

[2]  See Doc. 17 at 3-4, ¶ 7(a)-(m) for a complete list of the materials Defendant seeks.

(10th Cir. 1992); see also United States v. Morales-Zamora, 914 F.2d 200, 205 (10th Cir. 1990) (holding that probable cause is supplied when a dog alerts to a vehicle). A sampling of cases from other circuits shows the wide recognition that this rule enjoys, though courts differ as to what they will accept or require for purposes of proving reliability. For example, in United States v. Diaz, the Sixth Circuit held that "[a] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." United States v. Diaz, 25 F.3d 392, 393-394 (6th Cir. 1994). Diaz also instructs, however, that "[f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established." Id. at 394. Still, "[w]hen the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog." Id.

In United States v. Williams, the Fifth Circuit held that "a showing of the dog's reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle." United States v. Williams, 69 F.3d 27, 28 (5th Cir. 1995). In the Seventh Circuit, probable cause was established from the sniff of a dog that graduated from a training class in drug detection and had proven reliable in detecting drugs and narcotics on prior occasions. United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980). The Fourth Circuit has stated that the detection of narcotics by a trained dog is generally sufficient to establish probable cause, but "implicit in [that] statement . . . is the assumption that a drug dog's positive alert for

contraband must possess some indicia of reliability for the alert to establish probable cause."
United States v. Chung Wu, 2007 WL 412169, at *5 (4th Cir. Feb. 2, 2007) (unpublished opinion).

In the pretrial-discovery context, the Tenth Circuit has held that canine training records and related documents are not relevant where a dog that is certified on the day in question properly alerts to the presence of contraband. United States v. Gonzalez-Acosta, 989 F.2d 384, 388-389 (10th Cir. 1993) (upholding district court's denial of request for training records, veterinary records, false-positive/false-negative alert records, and all other records establishing dog's ability to smell where dog, certified on the day in question, properly alerted to the presence of contraband). Still, while a dog alert usually is at least as reliable as many other sources of probable cause, and has been called by the Tenth Circuit "certainly reliable enough" to create the fair probability of the existence of contraband that is a prerequisite to a finding of such cause, a dog alert might not give rise to probable cause if the particular dog has a poor accuracy record. United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993); cf. Gonzalez-Acosta, 989 F.2d at 388-389 (although dog had been seriously injured several months prior to search, defendant was not entitled to records related to dog's ability to smell to form probable cause because dog was certified at time of search and properly alerted to presence of marijuana). Indeed,

> [t]here may be circumstances where a more complete investigation is required, because the reliability presumed from certification and training is subject to question. These may include that the dog's training or certification was substandard, that the health of the dog was such as to possibly affect

17

reliability, and that the circumstances of the particular search
raise issues regarding the dog's reliability.

United States v. Lambert, 351 F.Supp.2d 1154, 1162 (D.Kan. 2004) (*quoting* United States

v. Wood, 915 F.Supp. 1126, 1136 (D.Kan.1996), *rev'd on other grounds*, 106 F.3d 942 (10th

Cir.1997); see also United States v. Florez, 871 F.Supp. 1411, 1419-20 (D.N.M. 1994)

(granting suppression motion after expressly finding handler's testimony inconsistent and not

sufficiently credible to establish dog's reliability).

The instant case, however, is not one warranting further investigation into Laika's

reliability.  To the contrary, that Laika was certified on the date in question and correctly

alerted to the presence of contraband is sufficient to establish her reliability under the

circumstances .  At the suppression hearing, Matthew Devaney testified in great detail as to

the standards to be met and the scores to be achieved before a dog will be certified by the

National Canine Facility.  He also testified that a dog must additionally attend and pass a

program administered by the United States Border Patrol Protection Training School in order

to become certified.  According to Mr. Devaney, Laika not only successfully completed the

certification process but did so with above-average scores.  Laika also attends monthly

maintenance/continuing training programs.  She has never failed and had to retake a test

administered as part of these programs. Although Laika has nonproductively alerted in the

past, the Court, having reviewed the totality of the circumstances, gives this fact little weight,

as the credible testimony also established that (1) a nonproductive alert, which by definition

occurs in the field and therefore cannot be tested as a miss the same way a false indication

can be tested, does not necessarily mean that a dog has acted erroneously; and (2) Laika has never falsely indicated, meaning she has never had a miss in a controlled training environment. In sum, the reliability presumed from Laika's certification and training is not subject to question. See Lambert, 351 F.Supp.2d at 1162. There has been no evidence that her training or certification was substandard; to the contrary, the training program as thoroughly described by Mr. Devaney in his testimony was portrayed as quite rigorous. There similarly was no evidence presented that Laika's health may have affected—or that the circumstances of the search in question raise issues regarding—her reliability. Id.

Defendant's request for additional documentation is based largely on his assertion that he did not observe Laika alert "in any recognizable way" and, therefore, probable cause to search cannot be assured. [See Doc. 17 at 2]. The Court is not persuaded by this argument. According to Agent Hubert, Laika was on alert as she leapt through the driver-side window of Defendant's car. She then jumped into the backseat, where she lay down. Agent Hubert recognized Laika's action as a passive indication. According to Mr. Devaney, all United States Border patrol dogs are trained in passive indication. Mr. Devaney also credibly testified that alerts are "dog-specific," and that a handler is trained to recognize his or her particular dog's unique manner of alert. At the time Laika leapt into the driver-side window of the car, Defendant was sitting on a bench ten feet away from the car and facing its passenger side. That Defendant, not surprisingly, did not see or recognize Laika's lying down as an indication does not alter the fact that Laika properly alerted and indicated to the presence of contraband in his vehicle.

19

Defendant has attempted to compare his discovery request in this case to other contexts, such as DNA testing, in which samples of the Government's evidence and records pertaining to their analysis are routinely produced for independent review by a defense expert.  I find that this comparison is inapposite for the following reasons.  First, unlike the use of DNA testing to prove a suspect's identity beyond a reasonable doubt at trial, the purpose of a canine inspection is simply to determine whether there is probable cause to search a particular location for the source of odors the dog is trained to detect.  Because probable cause is a lesser evidentiary standard than proof beyond a reasonable doubt, the methods used to determine probable cause require a less rigorous showing of reliability, and allow for a greater margin of error, than those used in identifying a suspect's DNA during the Government's case-in-chief at trial.

Also unlike other contexts such as DNA testing, the canine inspection used as a basis for establishing probable cause in this case was not performed in a laboratory under controlled conditions that a defense expert might duplicate at a later time, nor is there a sample of the odors present at the site of the canine inspection that can be collected and preserved for later use by a defense expert.  For these reasons, a court facing the issue of a discovery request concerning a dog's reliability, and any expert retained by a defendant, cannot avoid consideration of information supplied by witnesses present at the scene in order to assess the reliability of a canine inspection in this context.  In this regard, it is important that a court before whom this evidence is presented take care to assess the credibility of the witnesses and the credibility and reliability of the evidence tendered.

For the purpose of establishing probable cause during Border Patrol field operations, it follows that the reliability of a canine inspection generally can be determined on the basis of testimony provided by a dog's handler and/or a representative of the certifying agency, in conjunction with an inspection of the document(s) that identify the date on which the dog and handler were certified, their certification score, and the name of the certifying agency. Through such testimony and inspection of the certification documents, defendants are provided with a fair opportunity to make a threshold showing that the dog and handler were not certified at the time of the canine inspection at issue, or that there is a specific reason to question the validity or reliability of the certification. Where neither the witness' testimony, other tendered evidence, nor the certification documents establish such a threshold showing, however, no legitimate purpose is served by requiring the Government to produce additional supporting documentation in response to a blanket request for all records relating in any way to the training or past performance of a dog and its handler.

In this case, Defense counsel had an opportunity to cross-examine Mr. Devaney and other Government witnesses in order to make the threshold showing described above. Counsel did not make such a showing. For these reasons, the Court concludes that her certification, in combination with her proper alert, is sufficient to establish Laika's reliability.

Finally, the Court takes judicial notice of the *Order* entered February 7, 2007, by the Honorable Robert C. Brack in United States v. Robert N. Forbes, Jr., No. CR 06-1578 RB [Doc. 39], wherein Judge Brack, having determined, among other things, that Laika was properly certified on the day in question, denied a defense motion similarly seeking

disclosure of various materials concerning her training and certification. See Green v. Nottingham, 90 F.3d 415, 418 (10th Cir. 1996) (federal courts may take notice of judicial proceedings in other courts if they have a direct relation to matters at issue). For the foregoing reasons, the Court concludes that additional investigation into Laika's reliability is not warranted here; Defendant's discovery motion therefore will be denied.

### B. *Mr. Morales' Motion for Suppression of Evidence and Incorporated Memorandum [Doc. 16]*

Defendant next moves to suppress evidence obtained as a result of the search of his vehicle on grounds that (1) the referral of his car to secondary was without reasonable suspicion; and (2) the subsequent warrantless search of the vehicle was not supported by probable cause, consent, or exigent circumstances. [Doc. 16 at 3-4]. The Government responds that the suppression motion is meritless because there existed both reasonable suspicion to refer the car to secondary and probable cause then to search it. [Doc. 20 at 10-13].

### 1. Referral to Secondary

"Supreme Court teachings instruct[] that no particularized reason need exist to justify referring a motorist to a secondary inspection area."[3] United States v. Sanders, 937 F.2d

---

[3] Alternatively, the Court notes that Defendant admits that he consented to have Laika check his vehicle (though he did not consent to have Laika enter the vehicle). [See Doc. 16 at 2 ("Although there was no basis for a suspicion that Mr. Morales was carrying contraband or otherwise engaged in illegality, the agent asked for consent to have a drug detecting dog check the car. *Mr. Morales gave that consent[.]*") (emphasis added)]. Defendant then was referred to secondary. The Tenth Circuit has held that consent to search a vehicle in a secondary inspection area, so long as that consent was not obtained during an illegal detention, justifies further detention. United States v. Maestas, 2 F.3d 1485, 1492-93 (10th Cir. 1993) (*citing* United States

1495, 1499-1500 (10th Cir. 1991) (*citing* United States v. Martinez-Fuerte, 428 U.S. 543, 563 (1976)).  Indeed, where, as here, the stop occurs at a fixed checkpoint (as opposed to during a roving patrol) "border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity."  United States v. Massie, 65 F.3d 843, 847 (10th Cir. 1995).  Border patrol agents have virtually unlimited discretion to refer cars to the secondary inspection area and may do so in the absence of individualized suspicion.  Id. (internal quotations omitted).  This is "because the public has a substantial interest in protecting the integrity of our national borders, and the intrusion upon one's right to privacy and personal security by a routine border inspection is minimal . . . ."  United States v. Rascon-Ortiz, 994 F.2d 749, 752 (10th Cir. 1993)

Agents' "virtually unlimited discretion" is, however, limited in one important respect—the *overall* detention cannot exceed a routine checkpoint stop[4] if probable cause, consent, or reasonable suspicion does not exist.  Rascon-Ortiz, 994 F.2d at 753.  Such a limit is necessitated by the Fourth Amendment's key principle of reasonableness and the Supreme

---

v. Martinez-Fuerte, 428 U.S. 543, 567 (1976)).  Defendant has not alleged that the initial stop of his vehicle was illegal.

[4]  A "routine checkpoint stop," which must be brief and unintrusive, generally involves questions concerning the motorist's citizenship or immigration status, and a request for documentation.  A cursory visual inspection of the vehicle is also routine, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.  Rascon-Ortiz, 994 F.2d at 752.

Court's analysis in <u>Martinez-Fuerte</u>.  But "[w]hether the routine checkpoint stop is conducted at primary, secondary, or both is irrelevant to Fourth Amendment concerns." <u>Id.</u>  Instead, the true focus is the reasonable suspicion that must exist when a detention is prolonged beyond the scope of a routine checkpoint stop.  <u>Id.</u>  As the Tenth Circuit has stated,

> [o]bviously, if a secondary inspection area is such that it causes the detention to exceed a routine checkpoint stop because it is overly intrusive or lengthy, the secondary inspection becomes relevant in a Fourth Amendment analysis; *however, the relevancy would still be based upon the reasonableness of the detention as determined by balancing Fourth Amendment interests, and not merely because the detention occurred at secondary.*

<u>Id.</u> n.8 (emphasis added).  Or, as the Fifth Circuit has phrased it, "[t]he constitutionality of a seizure at a checkpoint stop depends on its duration, not its location."  <u>United States v. Machuca-Barrera</u>, 261 F.3d 425, 435 n.35 (5th Cir. 2001).

Additionally, a border patrol agent who observes "suspicious circumstances" may briefly question a motorist concerning those suspicions and ask the motorist to explain, since "[t]he Fourth Amendment does not require police officers to close their eyes to suspicious circumstances."  <u>Sanders</u>, 937 F.2d at 1500.  "While there is no single definition of what constitutes a 'suspicious circumstance,' border patrol agents are given deference in relying upon their law enforcement training and past experience in deciding whether a suspicious circumstance exists."  <u>Rascon-Ortiz</u>, 994 F.2d at 753.  "Suspicious circumstance" is not synonymous with "reasonable suspicion." Instead, the presence of a suspicious circumstance allows a border patrol agent to ask a few additional questions concerning the suspicion

24

during the course of a routine customs inspection. Since the additional questions do not add significantly to the length or intrusiveness of the detention, the more rigid Fourth Amendment requirements of probable cause or reasonable suspicion do not apply.  Id. n.6.

While recognizing that Agent Sanchez needed no particularized reason to refer Defendant to secondary, this Court alternatively concludes that, given the totality of the circumstances, see Sanders, 937 F.2d at 1501, reasonable suspicion supported Defendant's continued detention and questioning, whether at primary or secondary.  See Massie, 65 F.3d at 849.  The credible suppression-hearing testimony established that Defendant hesitated when Agent Sanchez asked the name of the friend he was going to visit, and did not even know his friend's last name.  He also presented his vehicle registration with a visibly shaking hand.  See Rascon-Ortiz, 994 F.2d at 753 (nervousness constitutes suspicious circumstance). Additionally, Agent Sanchez noticed that the carpeting in the area of the driver-side rear window, under the lower section of the rear seats, had been tampered with, such that it was "sticking out in an unusual manner."  Agent Sanchez testified that, in his experience working at the border checkpoint, altered carpet such as he observed in Defendant's car gives him "reasonable belief that there might be something concealed within the car."   For these reasons, Agent Sanchez referred Defendant to secondary.  This Court concludes that the referral was reasonable and proper under the circumstances.

## 2. Warrantless Search of Defendant's Vehicle

Defendant also moves to suppress the seized evidence on the ground that his vehicle was searched without a warrant and in the absence of consent, exigent circumstances, or

probable cause.  [Doc. 16 at 4-5].  "In order to search a vehicle at a traffic checkpoint, agents must have probable cause or consent."  Rascon-Ortiz, 994 F.2d at 754 (*quoting* United States v. Ortiz, 422 U.S. 891, 896-97 (1975)).  A warrantless search of an automobile is reasonable if there is probable cause to believe it contains contraband.  Ludwig, 10 F.3d at 1538.  As the Tenth Circuit has repeatedly explained, "[p]robable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed."  United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007).  In the specific context of a dog sniff, however, and as discussed above in Section II.A., once a dog alerts to the presence of narcotics, border patrol agents have probable cause to search a vehicle for narcotics.  Pinedo-Montoya, 966 F.2d at 594.  In this case, once Laika alerted and indicated by lying down in the back seat, the agents had probable cause to search Defendant's vehicle consistent with the Fourth Amendment.

One final point meriting brief discussion—and one that Defendant raised in his written motion but did not address further at the hearing—is the manner by which Laika entered the vehicle.  According to Defendant, after being escorted around the vehicle, Laika "was then placed inside the car, [where she] made no sign or alert."  [Doc. 16 at 3].  The Government responds that "Laika jumped into the vehicle through the driver's side window which had been left open by the [D]efendant as she was simultaneously alerting to the presence of narcotics therein, although the [D]efendant characterizes the alert as Laika being placed inside the [D]efendant's vehicle."  [Doc. 20 at 12].

In United States v. Stone, the Tenth Circuit held that the Fourth Amendment was not implicated when a trained drug dog leapt into the open hatchback door of a suspect's car during a valid Terry[5] stop because the dog's action was "instinctive." United States v. Stone, 866 F.2d 359, 363-364 (10th Cir.1989); see also United States v. Hutchinson, 471 F.Supp.2d 497 (M.D.Pa. 2007).[6]  The defendant had opened the hatchback to search for a traffic ticket or citation that the detaining police officer had asked to see. Although the dog became interested in the area underneath the passenger side of the car while still outside of it, it was not until the dog had actually jumped into the car that he positively "keyed" to a duffel bag containing approximately 33,000 methaqualone tablets.  The dog's alert gave rise to probable

---

[5]  Terry v. Ohio, 392 U.S. 1 (1968).

[6]  In Hutchinson, the canine Zeus entered the defendant's car via an open window and then alerted to a duffel bag on the back seat.  Concluding that the reasoning of Stone is sound, the District Court for the Middle District of Pennsylvania denied the defendant's motion to suppress marijuana found in the duffel bag, holding that

> [w]here an officer opens a vehicle or other container to assist a canine in detecting the presence of contraband, and where the canine has not already positively alerted or indicated that it has detected the scent of contraband within the container, it seems logical to conclude that the "plain smell" doctrine should have no application, since the positive sniff that results was presumably aided or achieved impermissibly by the officer's manipulation of the container. In contrast, where a canine makes entry of its own accord due to its independent reaction to an odor emanating from the car, the plain sniff rule would apply because the dog was not aided in its sniff by an intervening officer and the dog detected the odor in an area in which it was lawfully present.

Hutchinson, 471 F.Supp.2d at 510.  Zeus's sniff was not a Fourth Amendment search where "nothing in the record suggests [his handler] Officer Carrera placed Zeus in the [car] to assist his sniff, and the record would not support a finding that Officer Carrera actively encouraged Zeus to enter the car."  Id.

cause to search the car, and even though "the dog created a troubling issue under the Fourth Amendment when it entered the hatchback[,]" the police, who neither asked the defendant to open the hatchback so that the dog could jump in nor encouraged the dog to do so, "remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics." Id.

Stone was distinguished by and deemed inapplicable in United States v. Winningham, where border patrol agents stopped a van on the reasonable suspicion it might be carrying undocumented aliens. United States v. Winningham, 140 F.3d 1328, 1329 (10th Cir. 1998). An agent who asked for and received consent to search the van opened the vehicle's sliding door to conduct a visual inspection. Finding nobody inside, the agent left the door opened, told the defendant that he also had information the van was carrying narcotics, and asked for permission to conduct a canine inspection. The dog, which arrived 5 or 6 minutes later, began sniffing at the front of the van before moving to the rear, where he was unleashed. He then jumped inside the van and alerted at a rear vent in which agents discovered 50 kilograms of marijuana. Id. at 1330.

The district court distinguished Stone, granted the defendant's motion to suppress, and denied a motion by the Government for reconsideration. Affirming, the Tenth Circuit held that Stone was distinguishable in two material respects:

> First, our holding in Stone was driven not by what the officers did, but what they did not do:
>
>> There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback

> so the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car. The judge asked the Officer in charge of the dog: "So you didn't encourage him or discourage him from jumping into the back?" And the Officer replied: "That's correct. I just let his leash go and let him go where his nose would take him." In these circumstances, we think the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics.

> Stone, 866 F.2d at 364. In Mr. Winningham's case, the officers themselves opened the door, allowing the van to sit on the side of the highway with the sliding door wide open for a period of at least six minutes until the drug dog could arrive. The dog handler then unleashed the dog as the dog neared the open door. A desire to *facilitate* a dog sniff of the van's interior, absent in Stone, seems readily apparent here.

Winningham, 140 F.3d at 1330-31 (emphasis in original).

In this case, the credible and undisputed suppression-hearing testimony disclosed that Laika began to alert as she approached the driver-side door of Defendant's vehicle and was on alert as she jumped into the vehicle through the open driver-side window.  No evidence was presented to support a conclusion that Agent Hubert or anyone else placed or helped Laika into the vehicle.  To the contrary, Laika's entry into Defendant's car appears to have been wholly instinctive.  For that reason, the Court determines that this point is controlled by Stone rather than by Winningham.  In light of the foregoing, the Court will deny Defendant's motion to suppress.

29

**C. *Mr. Morales' Motion for Daubert Hearing or, in the Alternative, to Exclude Evidence of Alleged Dog Alert Under Daubert* [Doc. 28]**

Defendant has "request[ed] that the Court set this matter for a hearing to determine whether the manner in which [Laika] was trained, maintained and applied in the field conforms with well-settled principles by other experts in the field, and thus satisfies the criteria of *Daubert* and *Kumho Tire*."[7]   [Doc. 41 at  4].   The Government contends that a hearing is both inappropriate and unnecessary.   [See Docs. 34 and 42].

In United States v. Berrelleza, the Tenth Circuit held that the defendant was not entitled to a Daubert hearing to test the expertise of either the dog that alerted to the presence of cocaine or the dog's handler, since "a Daubert hearing is the wrong procedural tool to challenge the reliability of a drug detection dog."  United States v. Berrelleza, 90 Fed.Appx. 361, 365 (10th Cir. 2004) (unpublished).   Berrelleza relied on United States v. Outlaw, wherein the district court explained that

> [a] Daubert hearing is the wrong procedural vehicle through which to challenge the reliability of a canine alert. A Daubert hearing presupposes that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The purpose of a Daubert hearing is to determine whether expert testimony meets the threshold of reliability so that the trier of fact may rely on such testimony to determine a fact issue. An example of a fact issue embraced by Daubert is whether or not a certain chemical caused a plaintiff to develop cancer. In contrast, the purpose of allowing [the dog's handler]

---

[7]  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

> to testify that [the dog] alerted to the black suitcase is not to prove that the chemicals found were actually an illegal narcotic; rather, the testimony is intended to establish that [the handler] had an articulable basis for believing that the suitcase contained contraband items and that the owner was involved in illegal activity. It is not a fact issue as contemplated under <u>Daubert</u>. Therefore, a <u>Daubert</u> hearing is not warranted.

<u>United States v. Outlaw</u>, 134 F.Supp.2d 807, 810 (W.D.Tex.2001).

This Court agrees with the Government that a Daubert hearing is neither appropriate, <u>see</u> <u>Berrelleza</u>, 90 Fed.Appx. at 365, nor necessary, <u>see</u> <u>Outlaw</u>, 134 F.Supp.2d at 810, since Defendant was provided ample opportunity to test and challenge the reliability of both Laika and Agent Hubert at the March 1 and 27, 2007 hearings on the other motions. To be sure, at the first hearing, Mr. Devaney provided in-depth testimony as to (1) the training that Laika and Agent Hubert received, both individually and as a team, as part of the certification process; (2) the certification process in general; (3) the meaning of the scores the team achieved in becoming certified; and (4) the team's above-average ability. This testimony was tested through cross-examination and the hearing was continued to March 27 specifically to allow counsel for Defendant an opportunity to question Mr. Devaney further.[8] Agent Hubert testified as to the training that he and Laika received and continue to receive, as well as to Laika's performance both in and out of the field. This testimony also was tested through cross-examination. Because Laika's reliability has already been adequately tested, and because "a <u>Daubert</u> hearing is the wrong procedural tool to challenge the reliability of

---

[8] Counsel informed the Court at the March 27 hearing that he no longer wished to continue questioning Mr. Devaney.

31

a drug detection dog[,]" see Berrelleza, 90 Fed.Appx. at 365, the Court will deny Defendant's motion for a Daubert hearing.

**III.     CONCLUSION**

For the reasons expressed herein, Defendant's motions are denied.

**IT IS, THEREFORE, ORDERED** that *Mr. Morales' Motion for Suppression of Evidence and Incorporated Memorandum* [Doc. 16] is **DENIED**;

**IT IS FURTHER ORDERED** that *Mr. Morales' Motion for Discovery* [Doc. 17] is **DENIED**;

**IT IS FURTHER ORDERED** that *Mr. Morales' Motion for Daubert Hearing or, in the Alternative, to Exclude Evidence of Alleged Dog Alert Under Daubert* [Doc. 28] is **DENIED**.

**SO ORDERED** this 10th day of May, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

32